IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 1:20-CR-10 |
| | : | |
| v. | : | (Judge Wilson) |
| | : | |
| JAMES LARNERD | : | Electronically filed |

# REPLY BRIEF IN SUPPORT
# OF
# MOTION TO SUPPRESS EVIDENCE

**I. Introduction:**

A suppression hearing was held before the Court on October 22, 2020. The only witness was Patrolman John Houser of the North Cornwall Police Department, Lebanon, PA. Patrolman Houser was the investigating officer and prepared the application for the search warrant issued by a Lebanon County District Justice on June 3, 2019 for the premises at 327 Quattapahilla Drive, North Cornwall Township, Lebanon County, PA. That residence was then occupied by Defendants James Larnerd and Rebecca Swift, as well as Dusty Shutter and Felicia Revely. The search was conducted on June 4, 2019. Larnerd Exhibit A.

A Motion to Suppress Evidence was filed on behalf of Mr. Larnerd on August 19, 2020 (Doc. 46). An initial Brief in Support of the Motion to Suppress Evidence was likewise filed on August 19, 2019 (Doc. 47). The Government filed a Brief in Opposition to Defendants' Motions to Suppress Evidence on November 20, 2020 (Doc. 71). Trial is currently scheduled for February 1, 2021 (Doc. 69).

1

For ease of reference, the exhibits offered by Defendant Larnerd and admitted into evidence at the suppression hearing are listed below.[1]

## II. Lack of Corroboration:

Officer Houser testified that the information in the affidavit of probable cause for the search warrant came almost exclusively from Erma Williams, with incidental additional information from Joanne Nye. Transcript of Suppression Hearing (TSH), p.9. On June 1, 2019 Officer Houser called Ms. Nye concerning a report she had made to the police on May 17, 2019 that there were multiple vehicles arriving at 327 Quittapahilla Drive and leaving after a short period of time. TSH, p.10. Ms. Nye was not able to tell the police why the vehicles were coming to the residence; nor did Ms. Nye provide any information concerning firearms at the residence. TSH, p.9-10; 19. Officer Houser acknowledged that there was no corroboration for Ms. Williams' statement alleging the presence of firearms in the house. TSH, p.19.

Other than Ms. Nye's statement, included in the search warrant application, that "multiple vehicles visit the residence every evening and the occupants enter the residence for short periods of time such as 10-15 minutes before leaving," (Larnerd Exhibit A, p.2, paragraph 4), there was no corroboration at all for any of the statements made to Officer Houser by Erma Williams. If, as Ms. Williams claimed, drug dealing had been ongoing at the residence since November, 2018, (Larnerd

---

[1] Larnerd Exhibit A: Search Warrant and Affidavit of Probable Cause.
  Larnerd Exhibit B: Incident Report by Patrolman John C. Houser.
  Larnerd Exhibit C: Middletown Police Complaint–Erma Williams.
  Larnerd Exhibit D: PA State Police Lab Report.
  Larnerd Exhibit E: Erma Williams Handwritten Statement.
  Larnerd Exhibit F: Dauphin County Docket Sheet, No. CP-22-CR-1195-2019.
  Larnerd Exhibit G: York County Docket Sheet, No. CP-67-CR-4436-2018.
  Larnerd Exhibit H: Dauphin County Docket Sheet, No. CP-22-4429-2018.

Exhibit B, p.9), then there were no exigent circumstances as of June 1, 2019 demanding an immediate search, and further corroboration of Ms. Williams' accusations could have been secured by the police. However, no police surveillance was conducted to corroborate the statements of Ms. Williams concerning either the alleged drugs or the alleged firearms. Neither were any controlled or undercover drug buys conducted from James Larnerd, Rebecca Swift, or the other two residents of the house, Dusty Shutter and Felicia Revely. There was no effort by the police to interview the owner of the house, Gregory Kline. There was no effort by the police to ask Ms. Williams for the names of other persons who had allegedly purchased controlled substances from the house during the seven or eight months she claimed that drug dealing by James Larnerd had been ongoing. There was no review of the cell phone or Facebook Messenger call records of Mr. Larnerd, despite Ms. Williams' claim, appearing in the affidavit of probable cause, that "Larnerd used facebook message on his cellular phone to conduct narcotics sales." Larnerd Exhibit A, p.3, paragraph 5; Larnerd Exhibit B, p.10; TSH, p.21-22.

      Ms. Nye's original complaint to the police of "suspicious vehicle traffic to the residence" had been made on May 17, 2019, (Larnerd Exhibit A, p.2, paragraph 4), which was 18 days before the search on June 4. The argument that as of June 1 the police had to move quickly since the drugs Ms. Williams claimed were in the house might not be there for long contradicts the information the police had from both Ms. Williams and Ms. Nye about the ongoing nature of the offense, and contradicts the entire prosecution theory of the case that the distribution of controlled substances from the residence was frequent ("every day" and "every evening") and continuing. Larnerd Exhibit A, p.2, paragraph 4.

      Count Five of the indictment in this case charges James Larnerd with a violation of 21

U.S.C.§ 856(a)(1), Using or Maintaining Drug Premises, from "on or about November of 2018 through June 4, 2019..."  Thus, the argument that the police had to move quickly based on the statements of Erma Williams since if time was taken for surveillance, controlled or undercover buys, identification and interviews of recent purchasers, securing cell phone or Facebook Messenger records, etc., Ms. Williams' information might have grown stale, (TSH, p.74), once again contradicts the prosecution theory that drug dealing had occurred at the premises on a continuous basis for the seven or eight months between November, 2018 and June, 2019.

      Ms. Williams during her June 1, 2019 interview with Officer Houser asserted the following:

> Williams stated around November 2018 and on Larnerd began to sell narcotics from the residence more often.  She advised he got worse and worse and began selling more and more until she moved out in December 2018.

Larnerd Exhibit B, p. 9.  If that was true, and Ms.Williams' other assertions about drug sales and large amounts of controlled substances at the house in late May, 2018 were true, there was no reason for the police to forego securing at least some corroboration by at least one of the traditional methods mentioned above.  Such corroboration was particularly necessary in this case, where Officer Houser knew prior to his application for the search warrant that Ms. Williams could not be considered a reliable, credible source in light of: (1) her admitted history of drug use and her allegation that James Larnerd was her source for those drugs; and (2) her complaint against James Larnerd that he had refused to return her personal property despite months of repeated requests.  Based on those two facts alone, both known to Officer Houser prior to his application for the search warrant, Erma Williams could not be regarded as a disinterested "private citizen complainant" as characterized by the Government.  See *e.g.*, Government's Brief in Opposition to Defendants' Motions to Suppress Evidence (Doc. 71, p. 13).  There were also other specific, material problems with the reliability and

4

credibility of Erma Williams, as discussed below.

### III. Material Falsehood: Amount of Drugs Reported by Erma Williams:

In the affidavit of probable cause, and in his testimony, Officer Houser quoted Erma Williams as stating that she had observed 4-5 ounces of methamphetamine and 20 Ecstacy pills in the kitchen area of the house at 327 Quittapahilla Drive.  Larnerd Exhibit A, p.3, paragraph 6; TSH, p.15.  However, upon execution of the search warrant on June 4, 2019, the only drugs found in the residence were: .18 gram of methamphetamine in one bedroom; .88 gram of methamphetamine in a second bedroom; 147.60 grams of marijuana; and one tablet (.36 gram) containing amphetamine.  Larnerd Exhibit D; TSH, p.23.  The actual amounts of controlled substances found during the search were thus dramatically less than the "many more ounces remaining" that Ms. Williams claimed were in the house.  Exhibit E; TSH, p.24.  The trivial amounts actually found were rather only consistent with personal use by the two couples occupying the two bedrooms, where the respective amounts of methamphetamine were found.  Larnerd Exhibit B, p.11-12.  Ms. Williams had also claimed in her handwritten statement that she "watched him [Mr. Larnerd] measure and sell 1 ounce of meth" (Larnerd Exhibit E); and had observed Gregory Kline "purchase meth from Larnerd for $800."  Larnerd Exhibit B, p.10; TSH, p.22-25.

Officer Houser attempted to account for the dramatic discrepancy between the amounts of controlled substances Ms. Williams claimed were in the house on May 29 or May 30 (taking the dates most favorable to the prosecution: see part IV, below) and the amounts actually found during the search on June 4 by two theories.  Either the 4-5 ounces of methamphetamine and the 20 Ecstacy pills had all been sold during the intervening days; or there were hidden compartments in the house which contained drugs which the police failed to find during the search.  TSH, p.49-51; 24-25.  The

first is pure speculation based on claimed expert knowledge about the practices of drug dealers; and the second is derived from an unidentified cellmate of Mr. Larnerd, the statement of whom was not produced in any form at the hearing, other than as testified to by Officer Houser. TSH, p. 24-25. In any case, Officer Houser acknowledged that the cellmate's statement had not been made to the police as of the date Officer Houser prepared the affidavit of probable cause for the search warrant, (TSH, p.25), and is therefore irrelevant to the immediate issue.

It is submitted that in reference to the amounts of drugs Erma Williams claimed were in the house, it is just as reasonable to conclude that she was not truthful as it is to conclude that the large amounts of methamphetamine and Ecstacy had all been disposed of. Further, the alleged constancy of Mr. Larnerd's drug trafficking from that house, claimed to have been sustained for seven or eight months, is just as much a reason to expect, if true, that there would *always* be substantial amounts present as that the supply would be permitted to dwindle to nearly zero before being replenished.

The results of the failure of the officer to secure corroboration for the assertions of Erma Williams can in part be seen in the dramatic discrepancy between the large amounts of methamphetamine and Ecstacy she claimed to have seen at the house and the trivial amounts the police actually found. The failure of the officer to secure corroboration amounted to a reckless disregard for the truth, especially since Erma Williams' not only had a history of drug use but had made her first phone call to the police with a personal complaint against James Larnerd.

**IV. Material Falsehood: Date of Erma Williams' Visit to the House:**

Erma Williams was initially interviewed by Officer Houser on the telephone on May 31, 2019, and again at the North Cornwall Police station on June 1. During the May 31 interview Ms. Williams stated that she had been to the Quittapahilla Drive residence "approximately one week

6

ago," (Larnerd Exhibit B, p.8; TSH, p.13-14), although in her June 1 interview and in the affidavit of probable cause Officer Houser reported Ms. Williams as stating that she had been to the house "on Wednesday May 29, 2019 or Thursday May 30, 2019." Larnerd Exhibit A, p.3, paragraph 6; TSH, p.11-14. If as of Friday, May 31, 2019 Ms. Williams had been to the house "approximately one week ago," she would have been there on or about Friday, May 24, if not earlier that week, and in any event at least 10 days before issuance of the search warrant on June 3. TSH, p.13-14. The effect of the date of Ms. Williams' visit to the house becoming in the affidavit of probable cause "May 29 or May 30" was therefore to make her information more fresh, being only four or five days before the search warrant was issued, rather than at least 10 days before the search warrant was issued. TSH, p.11-14. It will be noted that Ms. Williams was not quoted in her June 1 interview as placing her visit to the house at "more than a week ago," as then would have been the case according to her May 31 statement. It is also worth noting that if on May 31 when Ms. Williams first spoke to Officer Houser she had been to the subject house only a day or two before, it would have been natural for her to say she had been to the house "yesterday" or "two days ago." It is anomalous for Ms. Williams to have used the expression "approximately one week ago" to describe an event which in fact occurred "yesterday," or "two days ago." It is submitted that it was reckless for Officer Houser to ignore the substantial discrepancy between Ms. Williams' differing claims of when she had been to the house, the difference being at least five or six days – enough time to both raise a staleness issue and weaken the argument of supposed exigency for a search being made quickly and to the neglect of any direct corroboration of the material facts alleged by Ms. Williams.

**V. Material Omission: Motive of Erma Williams to Accuse James Larnerd:**

In Erma Williams' original, anonymous call to the North Cornwall Police Department on

May 31, 2019 she stated the following to Police Secretary Pat Royer:

> She advised she wishes to retrieve property from the residence but is concerned because the current resident, James Larnerd has two firearms at the residence.  She also stated Larnerd is dealing meth from the residence.  She advised Larnerd is usually under the influence of narcotics and stated that two or more drug addicts have moved into the second floor area of the residence.  Royer informed her the property issue would be a civil matter and instructed her to call a constable.

Larnerd Exhibit B, p.8.  When Officer Houser later on May 31 spoke to Ms. Williams she provided further information.  However, it is revealing that in Ms. Williams' first, anonymous phone call to the police she did not simply complain about her personal property not being returned to her, but actually provided both more information and more detail on the unrelated accusations against James Larnerd, that "James Larnerd has two firearms at the residence," "Larnerd is dealing meth from the residence," "Larnerd is usually under the influence of narcotics," and "two or more drug addicts" were living in the residence.  The main weight of Ms. Williams' information to the police in fact consisted of accusations that Mr. Larnerd was engaged in criminal activity, rather than a simple complaint about being unable to retrieve her personal property.  Thus, it was clear from that first call that Ms. Williams had a grievance against James Larnerd, and was attempting to use the police for revenge.  Erma Williams was not a disinterested private citizen, like Joanne Nye, merely contacting the police concerning suspicious activity in the neighborhood.

When Officer Houser interviewed Erma Williams at the North Cornwall Police Station on June 1, 2019 she stated that she had lived at 327 Quittapahila Drive, owned by Gregory Kline, from March-April, 2018 until December, 2018.  Larnerd Exhibit B, p. 9.  Officer Houser's police report then stated the following:

> Williams stated upon moving out in December 2018 she had property in a storage unit.  After moving out Kline had moved her property from the storage unit

> into the residence at 327 Quitapahilla Dr. She stated she has been trying to retrieve her property from the residence for months by speaking with Kline but he and Larnerd refuse to return her property.

Larnerd Exhibit B, p. 9. Ms. Williams further stated to Officer Houser that on the day she went to the house in late May 2019 "she began asking about retrieving her property and Larnerd refused to return her property." Larnerd Exhibit B, p. 9. According to Ms. Williams' timeline, she had been repeatedly attempting to retrieve her personal property for five or six months, and was prevented from doing so by both James Larnerd and Gregory Kline, both of whom she then accused of narcotics activity at the house. While Ms. Williams claimed that the drug dealing by Mr. Larnerd had been ongoing, and indeed that "he got worse and worse and began selling more and more until she moved out in December 2018," Ms. Williams never called the police until six months later, when it was useful for her to do so. Larnerd Exhibit B, p.9. It was precisely her grievance against James Larnerd, not good citizenship, which motivated Erma Williams to call the police. Far from disclosing this motive in the affidavit of probable cause, the only information provided to the magistrate was one brief sentence stating that "Williams advised that on Wednesday May 29, 2019 or Thursday May 30, 2019 she went to 327 Quittapahilla Dr to retrieve property." Larnerd Exhibit A, p.3, paragraph 6. The protracted dispute about the property between Ms. Williams and Mr. Larnerd is not in the affidavit of probable cause. TSH, p.12.

The argument that Erma Williams was simply a disinterested private citizen making a good faith complaint about her personal property, and it was therefore not necessary to check her criminal history, is also insufficient in the face of the fact that two days before Officer Houser prepared the affidavit of probable cause he knew that Erma Williams had by her own claim engaged in multiple unlawful narcotics transactions with James Larnerd and others during the eight or nine months she

9

lived at 327 Quittapahilla Drive. Larnerd Exhibit A, p.2-3, paragraph 5; Larnerd Exhibit B, p.9-10. Officer Houser admitted that Erma Williams was "not a church girl in this situation." TSH, p.33.

Erma Williams had yet a further motive to make false accusations against James Larned, related to the Middletown, Pennsylvania criminal case addressed below.

### VI. Material Omission: Criminal History of Erma Williams:

At the time Officer Houser interviewed Erma Williams on May 31 and June 1, 2019 she had a criminal record in both York and Dauphin Counties (Larnerd Exhibits G and H); and pending charges in Dauphin County related to the theft of a firearm in Middletown. Larnerd Exhibits C and F. Officer Houser testified that although he checked James Larnerd's criminal history, and included that in his affidavit of probable cause, he did not check to see if Erma Williams had a criminal record. TSH, p.25-30; Exhibit A, p.3. Officer Houser only conducted a very limited check of Ms. Williams criminal history to determine whether she had any outstanding arrest warrants or probation warrants. TSH, p.26. Had Officer Houser more throughly checked the criminal history of Erma Williams he would have found the following, publicly available on the website of the Unified Judicial System of Pennsylvania:

A. Dauphin County No. CP-22-CR-4429-2018; Larnerd Exhibit H. The complaint in this case was filed on May 23, 2018 and charged Possession of a Small Amount of Marijuana and Possession of Drug Paraphernalia. The case was pending when Officer Houser interviewed Erma Williams on May 31 and June 1, 2019. Ms. Williams entered a guilty plea to Possession of Drug Paraphernalia on October 28, 2019 and was sentenced the same day to 12 months probation.

B. York County No. CP-67-CR-4436-2018; Larnerd Exhibit G. The complaint in this case was filed on April 20, 2018 and charged Possession of Marijuana and Possession of Drug

Paraphernalia. The case was resolved at the office of District Justice Scott Gross, at MJ-19309-CR-218-2018. Ms. Williams entered a guilty plea to Possession of Drug Paraphernalia on June 20, 2018 and a fine of $300 imposed the same day. No other penalty is recorded.

C. Dauphin County No. CP-22-CR-1195-2019; Larnerd Exhibits C and F. The complaint in this case was filed by the Middletown Police Department (Officer Keegan Wenner) on January 7, 2019 and charged Criminal Conspiracy (two counts) and Theft by Unlawful Taking (two counts: 9mm Beretta handgun; 143 rounds of ammunition, etc.). A second individual was charged in the same case: Commonwealth v. Brandon Marton Smith, Dauphin County No. CP-22-CR-933-2019. The offenses charged against Ms. Williams and Mr. Smith occurred in Middletown, Pennsylvania on or about November 5, 2018. Ms. Williams was arrested on January 16, 2019. The case was pending when Ms. Williams was interviewed by Officer Houser on May 31 and June 1, 2019.

On June 1, 2019, the same day Officer Houser interviewed Erma Williams at the police station, he spoke to someone (whose name he could not recall and did not enter into his police report) at the Middletown Police Department. Officer Houser's June 1 call was prompted by the fact that the Middletown Police had previously called the North Cornwall Police on November 23, 2018 with an inquiry about James Larnerd in connection with the theft of a 9mm Beretta in Middletown. As of that date, no arrest had been made for the theft of that gun. Officer Houser's Incident Report entry for June 1, 2019 states:

> Upon researching previous calls relating to 327 Quittapahila Dr. I found this department was dispatched to contact Middletown Police Department on 11/23/2018. Middletown PD was investigating a stolen firearm. They were investigating James Larnerd as a suspect.
>
> I made contact with Middletown PD who advised the theft involved a 9mm Beretta (SN#P94011Z), critical defense ammunition, and 143 full metal jacket

11

rounds. They advised they did not arrest Larnerd but have yet to recover the firearm. Larnerd Exhibit B, p.9; TSH, p.27. At the suppression hearing, Officer Houser testified that during his phone call with the Middletown Police on June 1, 2019 he was never told that a criminal complaint had been filed by the Middletown Police against Erma Williams on January 7, 2019 for the theft of the 9mm Beretta. Officer Houser testified as follows:

> Mr. Fetterhoff: Do you remember who you spoke to from the Middletown Police Department?
>
> Officer Houser: I do not.
>
> Mr. Fetterhoff: Does the name Officer Wenner, Keegan Wenner, ring a bell?
>
> Office Houser: I don't recall. I spoke with an officer, but I don't recall his name.
>
> Mr. Fetterhoff: In any event, your information as included in your police report here anyway, on page nine at the top, the entry for June 1 indicated – they the Middletown Police were investigating James Larnerd as a suspect. Do you see that?
>
> Officer Houser: Correct.
>
> Mr. Fetterhoff: And the next line is, "I made contact with Middletown PD, who advised the theft involved a 9-millimeter Beretta, ammunition 143 rounds. They advised they did not arrest Larnerd but have yet to recover the firearm." Do you see all that?
>
> Officer Houser: That's correct.
>
> Mr. Fetterhoff: Now that was on June 1st. Were you also told that, in fact, the Middletown Police had filed a criminal complaint against Erma Williams on January 7, five months before?
>
> Officer Houser: No, I don't recall them providing that information to me. When I – when I spoke with them it was in regards to – they had contact our department previously in regards to Mr. Larnerd and in regards to a theft of a firearm. So I was reaching out to them to determine if they had any updates on that information or what that case was involving Mr. Larnerd. So we didn't discuss my complainant, or Ms. Williams.

>Mr. Fetterhoff:  You spoke to them and they told you about the theft of the firearm in Middletown?
>
>Officer Houser:  Correct.
>
>Mr. Fetterhoff:  But they didn't tell you they had arrested somebody?
>
>Officer Houser:  Not that I recall.  Well, they told me that they did not arrest Mr. Larnerd and hadn't recovered the firearm.  I don't recall them providing any more information.
>
>Mr. Fetterhoff:  In fact, they had filed complaints against two separate individuals, a man named Brandon Smith and Erma Williams.  Does that refresh your recollection?
>
>Officer Houser:  That – I don't recall them providing that information to me.

TSH, p.27-28.  And further:

>Mr. Fetterhoff:  But were you aware that in that–this Middletown case involving the theft of that Beretta, Erma Williams had accused Mr. Larnerd if being the buyer of that gun?
>
>Officer Houser:  No.  When I contacted their police department, as in my report, I was contacting them in regards to what they contacted us about and what his involvement was.  And that was – that was basically the end of the information.  They didn't go into other details about other people in the case because I was calling about Mr. Larnerd.

TSH, p.29.  And finally:

>Mr. Fetterhoff:  Officer, I take it since you weren't aware of the Middletown complaint, even though – well, first of all, do you agree, just in general, that whoever you talked to at Middletown it was quite odd for them to tell you that James Larnerd was a suspect about the 9-millimeter Beretta and never told you that they had already arrested Ms. Williams?
>
>Officer Houser:  No.  ...I was inquiring into 327 Quittapahilla Drive and James Larnerd.  I can't even recall if I mentioned what my complainant's name was, because it wasn't really information to pass on to Middletown Police Department.
>
>Mr. Fetterhoff:  And you never inquired how it came to be that Middletown

>identified Mr. Larnerd as a suspect, and therefore, the fact that Ms. Williams was the source of that accusation never came to your attention?
>
>Officer Houser: I don't recall the exact conversation. I was basically calling about what they had contacted us about. I know that the conversation wasn't very lengthy or very detailed. But that was–that's all I can recall from the conversation.
>
>Mr. Fetterhoff: Were you aware that Ms. Williams's first court date in that Middletown case, the first date to appear in Dauphin County Court following her arraignment was May 30th, 2019, the day before she called your department?
>
>Officer Houser: Not that I recall, no.
>
>Mr. Fetterhoff: Are you aware that her – that this case, Ms. Williams's case in Dauphin County Court concerning the Middletown theft has been repeatedly continued ever since?
>
>Officer Houser: I don't have any knowledge of that case.

TSH, p.74-76; Larnerd Exhibit F.

Officer Houser thus testified that he learned almost nothing when he spoke to a Middletown Police officer, except that James Larnerd had originally been a suspect in that case, and that the stolen firearm had not been recovered. Same: Larnerd Exhibit B, p.9. Officer Houser's failure to get any other information at all is startling, at the least. Even if Officer Houser did learn nothing else, if he had merely asked one or two more questions of the Middletown Police he would have (and should have) learned that Erma Williams had been charged with the theft of the 9mm Beretta and had accused James Larnerd of being the buyer of that gun, five months before she was interviewed by Officer Houser and made additional uncorroborated accusations against James Larnerd yet again. The fact that Ms. Williams did not on her own disclose the truth about the Middletown case to Officer Houser, or the extent of her alleged unlawful dealings with James Larnerd, is by itself revealing of her lack of credibility. TSH, p.32-33; 43-45; 55-57.

The failure of Officer Houser, by his own admission, to secure even the most basic facts concerning the Middletown case resulted in the reckless omission from the affidavit of probable cause of the material information that Erma Williams was either an accomplice of James Larnerd in the Middletown case or had falsely accused him in that case. There is no third alternative. Either fact is damning to Ms. Williams' credibility. Either fact further removes her from the category of disinterested private citizen. Similar to the grievance Ms. Williams had against Mr. Larnerd concerning the return of her personal property, Ms. Williams' arrest in Middletown and her claimed complicity with and accusations against James Larnerd in that case should have been presented to the Lebanon magistrate for his consideration, especially as there was almost no corroboration for anything Ms. Williams said about James Larnerd and 327 Quittapahilla Drive beyond the report of a neighbor concerning unusual vehicle traffic. The failure of Officer Houser to determine Ms. Williams' criminal history, especially the Middletown case, when that information was easily and immediately available to him, amounts to reckless disregard for the truth, as does the resulting failure to include that information in the affidavit of probable cause. There can be no doubt that a neutral, detached magistrate would have wanted to know Ms. Williams' criminal history, and the facts which were alleged to have intimately connected Ms. Williams to Mr. Larnerd in the Middletown case. As it was, Ms. Williams reliability as it appeared in the affidavit of probable cause far exceeded the truth, not for one reason, but for all the reasons set forth in this Reply Brief.

**VII. Legal Argument:**

The legal analysis, argument, and citations set forth in Defendant Larnerd's Brief in Support of Motion To Suppress Evidence (Doc. 47) are incorporated by reference. That argument will be supplemented here by noting that the search warrant cannot be saved by a claim of the police

officer's good faith, since the affidavit contained reckless material falsehoods and recklessly omitted material facts.  United States v. Wallace, 419 Fed. Appx. 256 (3rd Cir. 2011).  The standard of "reckless disregard for the truth" under Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674 (1978) presupposes an absence of good faith.  Wilson v. Russo, 212 F.3d 781, 786-791 (3rd Cir. 2000).

## VIII. Conclusion:

For the reasons set forth above, it is submitted that the search warrant was fatally defective as a result of both material falsehoods and material omissions in the affidavit of probable cause, submitted by the affiant in reckless disregard for the truth.  There was also insufficient probable cause for the search warrant since the statements of a single witness, with a known personal grievance against Mr. Larnerd, and who had already accused Mr. Larnerd in the Middletown case, should have been corroborated by more than a neighbor's complaint about unusual vehicle activity.  It is therefore requested that the Court grant Defendant Larnerd's Motion to Suppress Evidence (Doc. 46), and suppress all of the evidence seized by the North Cornwall Police Department, and all evidence derived therefrom, resulting from the search and seizure conducted on June 4, 2019 at 327 Quittapahilla Drive, Lebanon, PA.

December 4, 2020                                           Respectfully submitted,

                                                          */s/ William A. Fetterhoff*
                                                          William A. Fetterhoff, Esq.
                                                          Myers Brier & Kelly
                                                          240 North Third Street
                                                          Suite 501
                                                          Harrisburg, PA 17101
                                                          E-mail: wfetterhoff@live.com
                                                          Telephone: (717) 856-7421

**CERTIFICATE OF SERVICE**

      The undersigned hereby certifies that the foregoing document was electronically served on the individuals listed below on the date indicated.

      Johnny Baer, Esq.
      Assistant U.S. Attorney
      Federal Building
      228 Walnut Street, Suite 220
      Harrisburg, PA 17101
      john.c.baer@usdoj.gov


      Craig E. Kauzlarich, Esq.      Rebecca Swift
      Abom & Kutulakis, LLP
      2 West High Street
      Carlisle, PA 17013
      cek@abomkutulakis.com


December 4, 2020      */s/ Willaim A. Fetterhoff*
      William A. Fetterhoff, Esq.
      Myers Brier & Kelly
      240 North Third Street
      Suite 501
      Harrisburg, PA 17101
      E-mail: wfetterhoff@live.com
      Telephone: (717) 856-7421