**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 1:20-CR-0010 |
| | : | |
| | : | |
| v. | : | |
| | : | |
| JAMES LARNERD and | : | |
| REBECCA SWIFT | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

Before the court are the motions to suppress evidence filed by Defendants

James Larnerd ("Larnerd") and Rebecca Swift ("Swift").  (Docs. 46, 56.)  The

motions challenge the truthfulness of factual statements made in the affidavit of

probable cause in support of a search warrant pursuant to *Franks v. Delaware*, 438

U.S. 154 (1978).  For the following reasons, the court will deny the motions to

suppress.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On January 15, 2020, Larnerd was charged by indictment with possession

with intent to distribute a controlled substance, in violation of 21 U.S.C.

§ 841(a)(1); possession of a firearm by a prohibited person, in violation of 18

U.S.C. §§ 922(g)(1) and 924(e); and using or maintaining drug premises, in

violation of 21 U.S.C. § 856(a)(1).  (Doc. 1.)  In the same indictment, Swift was

charged with two counts of false statement during purchase of a firearm, in

1

violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2).  (*Id.*)  Larnerd and Swift have both entered pleas of not guilty.  (Docs. 16, 22.)

According to the facts alleged in the indictment, Swift is accused of making false statements to a licensed firearms dealer on April 16 and 25, 2019, in connection with the purchase of two firearms.  (Doc. 1, pp. 1–4.)[1]  In both instances, Swift is accused of falsely stating that she was the actual buyer of the firearm when, in fact, she knew that she was not the actual buyer (i.e. Swift was a straw purchaser).  (*Id.*)  Larnerd is accused of possessing with intent to distribute an unspecified amount of methamphetamine on or about June 4, 2019; between April 25, 2019 and June 4, 2019, possessing two firearms despite knowing that he had previously been convicted of a crime punishable by imprisonment exceeding one year; and using and maintaining a premises located at 327 Quittapahilla Drive in North Cornwall Township, Pennsylvania from November of 2018 through June 4, 2019, for the purpose of unlawfully distributing methamphetamine.  (*Id.* at 4–6.)  The Government is seeking forfeiture of certain property connected with the alleged offenses.  (*Id.* at 7–9.)

Larnerd filed a motion to suppress evidence and brief in support on August 19, 2020, asking the court to schedule a *Franks* hearing and ultimately to order that all evidence seized by the North Cornwall Police Department in Lebanon,

---

[1] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

Pennsylvania during the search conducted on June 4, 2019 at 327 Quittapahilla

Drive in Lebanon be suppressed.  (Doc. 46, p. 5; Doc. 47.)  On the same date,

Swift filed a pretrial motion and brief in support requesting a *Franks* hearing and

the same ultimate relief as was requested by Larnerd, as well as suppression of the

contents of Swift's cell phone and evidence and testimony related to statements

made by Swift following the execution of the search warrant.  (Doc. 56, p. 6; Doc.

57.)

On August 31, 2020, the Government filed an unopposed motion requesting

an extension of time within which to file a response to Defendants' motions.  (Doc.

59.)  The Government asserted that the issues raised in the motions are fact-

specific, and the Government's response to allegations of material falsehoods and

the application of the "good faith exception" requires a fully developed record.

(*Id.*)  Accordingly, the Government requested permission to defer the filing of its

opposition brief until after the evidentiary hearing.  (*Id.*)  The court entered an

order on September 3, 2020, scheduling a *Franks* hearing based on the

determination that Defendants made an adequate preliminary showing to

demonstrate that a *Franks* hearing was appropriate, and granting the Government's

motion to defer filing its opposition brief until after the *Franks* hearing.  (Doc. 60.)

The court convened the *Franks* hearing on October 22, 2020.  The

Government then filed its opposition brief on November 20, 2020, and Defendants

filed their reply briefs on December 4, 2020.  (Docs. 71, 74, 75.)  Accordingly, Defendants' motions are ripe for review.

### JURISDICTION

This court has jurisdiction under 18 U.S.C. § 3231, which gives district courts original jurisdiction over cases in which offenses against the laws of the United States are alleged.

### STANDARD OF REVIEW

The Warrant Clause of the Fourth Amendment to the United States Constitution states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation."  U.S. CONST. AMEND. IV.  In *Franks*, the Supreme Court determined that a criminal defendant has the right to challenge the truthfulness of factual statements made in an affidavit of probable cause supporting a warrant subsequent to the ex parte issuance of the warrant.  438 U.S. at 171.

The Court set forth the procedure in *Franks* by which a defendant may overcome the general presumption that an affidavit of probable cause supporting a search warrant is valid.  As a threshold matter, the defendant must make a "substantial preliminary showing" that the affidavit contained a false statement, which was made knowingly or with reckless disregard for the truth, which is material to the finding of probable cause.  *Id*.  If that threshold showing is made, then the defendant must ultimately prove by a preponderance of the evidence at the

*Franks* hearing that:  (1) the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions were material, or necessary, to the probable cause determination.  *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997) (citing *Franks*, 438 U.S. at 171–72).

The Third Circuit has set forth standards to identify what constitutes "reckless disregard for the truth" regarding both false statements and omissions, as follows:

> In evaluating a claim that an officer both asserted and omitted facts with reckless disregard for the truth, we hold that: (1) omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would want to know; and (2) assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting.

*United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006) (quoting *Wilson v. Russo*, 212 F.3d 781, 787 (3d Cir. 2000)).  If the defendant establishes a falsehood in the affidavit that meets this standard, then the defendant must prove by a preponderance of the evidence that "probable cause does not exist under the corrected affidavit" in order to establish the materiality of the falsehood.  *Id.*

When assessing the materiality of a false statement, the court is required to excise the false statement from the affidavit through a redaction process.  *Id.* at 384.  In contrast, when assessing the materiality of an omission, the court must insert the omitted information into the original affidavit.  *Id.*  If the defendant

meets this burden, then "the Fourth Amendment requires that . . . the fruits of the search [must be] excluded to the same extent as if probable cause was lacking on the face of the affidavit." *United States v. Frost*, 999 F.2d 737, 743 (3d Cir. 1993) (quoting *Franks*, 438 U.S. at 156).

### FINDINGS OF FACT

On June 3, 2019, Patrolman Houser was the affiant for the purpose of preparing an application for a search warrant for 327 Quittapahilla Drive, North Cornwall Township, Lebanon County, Pennsylvania ("the residence").  (Hrg. Tr., p. 9; Def. Ex. A., p. 1.)[2]  The search warrant was issued by Magisterial District Judge Anthony Verna on June 3, 2019.  (Def. Ex. A, p. 1.)  As of June 3, 2019, Patrolman Houser had been a police officer for six years and was a member of the Lebanon County Drug Task Force.  He was a member of the Pennsylvania Narcotics Officers' Association, and also had training and experience identifying controlled substances and conducting investigations involving controlled substances and firearms.  (*Id.* at 2.)

The court reviewed Patrolman Houser's incident report as well as the testimony and exhibits introduced at the *Franks* hearing.  (*See* Def. Ex. B;Doc. 70.)

---

[2] The court refers to the *Franks* hearing transcript, Doc. 70, as "Hrg. Tr." and the exhibits that were admitted at the hearing, Doc. 65, as "Def. Ex. __."

Based on the review of this evidence, the court makes the following findings of fact.

The first law enforcement contact relevant to this investigation occurred on May 31, 2019, when an anonymous woman contacted the police department and left a message with the police department secretary, providing her phone number but not her name. The woman stated that she had personal property at 327 Quittapahilla Drive, and advised that she wished to retrieve her property, but was concerned that the current resident, James Larnerd, had two firearms at the residence, was dealing "meth" from the residence, and was frequently under the influence of narcotics. (Def. Ex. B, p. 8.)

Patrolman Houser called the phone number provided by the woman and left a voice message. The woman returned the call and identified herself as Erma Williams. (Hrg. Tr., p. 11; Def. Ex. B, p. 8.) Williams told Patrolman Houser that she had a property dispute with Larnerd and the property owner, Gregory Kline, who is her friend. She said that she formerly lived at the residence and had property that either remained at the residence or in a unit owned by Kline. She was trying to retrieve that property, and thus contacted the police department "as a private complainant in regards to that civil issue." (Hrg. Tr., p. 11.)

During this May 31, 2019 call, Williams also told Patrolman Houser that she was living at the residence when Larnerd and his girlfriend "Becky" moved into

the residence, that both are "heavy meth users," and that Larnerd progressed from "dealing meth slowly" to now "dealing ounces of meth frequently."  In addition, Williams advised that Larnerd is dealing marijuana, ecstasy, and crack cocaine. She said that she knows Larnerd is dealing "because he was dealing when she lived at the residence and Gregory Kline used to buy $800 worth of meth from Larnerd routinely."  She further advised that when she lived at the residence, "people would often drive to or walk to the residence throughout the day to purchase narcotics." During this call, Williams also told Patrolman Houser that she was at the residence "approximately one week ago"[3] and observed Larnerd packaging meth in the residence and displaying two firearms.  Williams agreed to meet with Patrolman Houser to further discuss the residence and activity on June 1, 2019.  (Def. Ex. B, p. 8.)

Upon receiving this information from Williams, Patrolman Houser conducted some additional investigation.  He requested a check on Williams and Larnerd on May 31, 2019.  He found that Williams was "clear wants/warrants/probation" and that Larnerd was "clear probation with multiple AOPC warrants out of county."  (*Id.* at 8.)  On June 1, 2019, Patrolman Houser learned that he had arrested Larnerd on September 26, 2018 for possession of

---

[3] The court notes that one week prior to the date when Williams spoke with Patrolman Houser was May 24, 2019.

methamphetamine and marijuana while conducting a traffic stop, and that

Larnerd's criminal history included "narcotic arrests" on six prior dates spanning

from 1996 to 2014.  (*Id.* at 9.)

It is now known that Ms. Williams had prior convictions in 2018 for

possession of drug paraphernalia in the Dauphin and York County Court of

Common Pleas.  (Def. Exs. G, H.)  However, Patrolman Houser did not have this

information when he prepared his affidavit of probable cause on June 3, 2019.

(Hrg. Tr., p. 32.)   He did not check her criminal history through NCIC because

"she came forward as a private complainant."  (*Id.*)  He did not feel it was

necessary to check her criminal history under the circumstances.  (*Id.* at 55–56.)

As a practical matter, he could have checked her criminal history, but that would

have involved an additional investigative step because that information is not

routinely provided when checking for warrants and probation.  (*Id.* at 67, 73.)

On June 1, 2019, Patrolman Houser researched prior complaints at the

residence and found that he was dispatched to the residence on May 17, 2019,

regarding a complaint of "suspicious behavior."[4]  (Def. Ex. B, p. 8.)  On June 1,

2019, Patrolman Houser made contact with the caller from the May 17, 2019

---

[4] At the October 22, 2020 hearing, Patrolman Houser testified that he was <u>not</u> the officer who responded to the complaint of suspicious behavior on May 17, 2019.  (Hrg. Tr., p. 10.) However, in his incident report, he noted that he was the officer dispatched on that date. (Def. Ex. B, p. 8.)  The court finds the incident report more reliable on this point because it was prepared closer in time to the facts stated in the report.

incident, Joanne Nye ("Nye"), who resides at 320 Quittapahilla Drive, a neighboring property to the residence. (*Id.*) She provided information of "heavy vehicle traffic" to the residence at issue every day, with multiple vehicles arriving and leaving after a short period of time of only ten to fifteen minutes. (*Id.*) Nye stated that this type of activity was currently taking place. Nye was not able to state why the vehicles were coming to the property or what was happening inside the residence. (Hrg. Tr., p. 10.) However, Patrolman Houser perceived this information as providing some corroboration of drug activity at the residence. (*Id.* at 19.)

While researching prior calls related to the residence at issue, Patrolman Houser also found that his police department was in contact with the Middletown Police Department on November 23, 2018, because that department was investigating Larnerd as a suspect in a case involving a stolen firearm and ammunition. Patrolman Houser contacted the Middletown Police Department on June 1, 2019, and was advised that they did not arrest Larnerd and had not recovered the firearm under investigation.[5] (Def. Ex. B, p. 9.)

---

[5] It is now known that Williams was charged by criminal complaint filed by Patrolman Keegan Wenner of the Middletown Police Department on January 7, 2019, with offenses related to the theft of a firearm, which Williams admitted selling to Larnerd. (Def. Exs. C, F.) However, Patrolman Houser was not advised of this fact during his telephone call with the Middletown Police Department and he was not otherwise aware of this fact when he prepared his affidavit of probable cause. (Hrg. Tr., pp. 27–30, 32.)

After completing these investigative steps, Patrolman Houser interviewed Williams in person at the North Cornwall Police Department on June 1, 2019.  He learned that Williams was friends with Kline, who owns the residence, and that she moved into the residence in March or April of 2018.  Larnerd and his girlfriend "Becky" moved in some time after her, but she could not recall the date.  Larnerd and Becky were meth users when they moved into the residence.  Williams stated that Larnerd was selling narcotics from the residence "more often" starting in or around November 2018, until she moved out in December 2018.  She knew that he was dealing meth in that time period because she was a meth user and purchased meth from him regularly, and she witnessed Larnerd selling meth to Kline on multiple occasions.  (Def. Ex. B, p. 9.)

Patrolman Houser learned that Williams had property in a storage unit when she moved out in December 2018, which Kline had moved into the residence.  She said that she had been trying to retrieve her property for months by speaking with Kline, but he and Larnerd refused to return her property.  Williams reported that she went to the residence on Wednesday, May 29, 2019 or Thursday May 30, 2019, to retrieve her property.  (Def. Ex. B, p. 9.)  Patrolman Houser was aware that Williams had some uncertainty about the exact date she went to the residence ranging from May 24 to May 30, 2019.  (Hrg. Tr., pp. 12–15.)

Williams told Patrolman Houser that on that occasion Larnerd let her in a side door leading to the kitchen area, where she observed that Kline was present and there was approximately four to five ounces of meth, marijuana, and approximately twenty ecstasy pills. She related that Larnerd looked like he was high and spoke openly about selling narcotics, and that she observed Kline purchase meth from Larnerd for $800. She further related that she saw Larnerd place two handguns on the kitchen counter. Williams stated that Larnerd told her that he would kill her if she came back to the residence again.[6] (Def. Ex. B, pp. 9–10.)

Williams was not a confidential informant. Patrolman Houser distinguished Williams from a confidential informant because he did not have criminal charges against her, there was no investigation into her, and she contacted the police department of her own free will. (Hrg. Tr., p. 54.) If she were a confidential informant, Patrolman Houser would have felt obligated to present some information in the affidavit of probable cause to assure the judicial officer that "this is a reliable informant," including but not limited to the relationship between the informant and the suspect and how the officer came into contact with the

---

[6] In her written statement, there was a slightly different description provided by Williams of this encounter. She stated that Larnerd actually threatened her with two handguns and said that if she entered the residence again without permission, she would be "dealt with." She also specified that she witnessed him "measure and sell 1 ounce of meth" and he had "many ounces remaining." (Def. Ex. E, p. 1.) The court does not find these slight discrepancies to be material.

informant.  (*Id.* at 52–53.)  He would also include information about the

informant's motive to provide information to law enforcement.  (*Id.* at 71.)

Patrolman Houser did not perceive that Williams felt any malice or ill will toward

Larnerd when he interviewed her based on her tone of voice, demeanor, or the

information she provided.  (*Id.* at 48–49.)  Rather, he perceived that she was

frustrated with her inability to get her property back.  (*Id.* at 49, 68.)

Patrolman Houser did not have any information to corroborate Williams'

statement that Larnerd possessed two firearms when he prepared the application

for a search warrant.  (*Id.* at 19.)  Patrolman Houser did not conduct police

surveillance of the residence prior to applying for a search warrant, and there were

no undercover or controlled buys of narcotics arranged by the police from the

residence.  (*Id.* at 19–20.)  Patrolman Houser did not attempt to interview Kline,

Swift, Larnerd, or any other person who had purchased methamphetamine from the

residence prior to applying for the warrant.  (*Id.* at 21–22.)  The patrolman also did

not review any cellphone records or Facebook messages prior to applying for the

warrant.  (*Id.* at 22.)  Patrolman Houser could have taken additional investigative

steps, but did not do so because of timing.  He felt that if he had taken the time to

do additional investigation, the information provided by Williams about narcotics

and firearms in the residence could have become stale.  (*Id.* at 72, 74.)

Patrolman Houser was aware that Williams implicated herself in illegal activity in Larnerd's residence, engaged in illegal drug use, and was buying drugs from Larnerd.  (*Id.* at 33.)  Patrolman Houser did not include information about Williams' drug use in his affidavit of probable cause because it didn't seem relevant to him.  (*Id.* at 63.)

Patrolman Houser described the information he obtained from Williams and Nye in paragraphs 2, 4, 5, and 6 in the affidavit of probable cause in support of his application for a search warrant.  (Def. Ex. A, pp. 2–3.)  He summarized that "as a result of information enclosed in this affidavit, your affiant is of the opinion and belief that James Larnerd . . . is using controlled substances inside the residence and in possession of illegal firearms in the residence."  (*Id.* at 3.)

The search warrant was executed on June 4, 2019.  Among other property items, the police department seized methamphetamine, marijuana, pills, various computer devices, cellphones, drug paraphernalia, cash, and two firearms.  (Def. Ex. A, "Receipt/Inventory".)  The quantity of methamphetamine seized during the search was significantly less than Williams had said was present in the residence on an earlier date.  (Hrg. Tr., pp. 23–24.)

At the time when the search warrant was executed, Swift was present in the home and she was detained in handcuffs.  Patrolman Houser read Swift the *Miranda* warnings while she was in custody at the residence, and she agreed to

14

speak with him.  Swift stated that she lived at the residence with her boyfriend, Larnerd, and that there was one handgun in the bedroom she shared with Larnerd as well as methamphetamine that belonged to her and her cellphone and a second handgun in a closet.  (Def. Ex. B, p. 10.)  Swift later permitted officers to forcibly open a lockbox found in the residence that contained a firearm, and provided additional inculpatory statements, incriminating information regarding Larnerd, and consent to search her phone.  (*Id.* at 11–12.)

## DISCUSSION

Larnerd and Swift argue that all evidence obtained as a result of the execution of the search warrant at the residence should be suppressed because the affidavit of probable cause in support of the search warrant was fatally defective as a result of both material falsehoods and omissions submitted by the affiant in reckless disregard for the truth.  As a result, Defendants maintain that there was insufficient probable cause for the search warrant.  The Government opposes Defendants' suppression motions, and counters that Defendants have not met their burden of proving material omissions or falsehoods.  In addition, the Government maintains that as a private citizen complainant, Williams should be presumed reliable.  In any event, the Government asserts that Patrolman Houser independently corroborated her statements and acted in good faith in the

preparation and presentation of the warrant to the magistrate.  Each argument is addressed in the following sections.

### A. Defendants' Challenges to the Truthfulness of Factual Statements Made in the Affidavit of Probable Cause

Defendants assert that Patrolman Houser both omitted information and included false information in reckless disregard for the truth in the affidavit of probable cause.  The Government disagrees with each of Defendants' challenges to the truthfulness of the factual statements made in the affidavit.

At this point, the court must determine whether Defendants have proven by a preponderance of the evidence that "the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant."  *Sherwood*, 113 F.3d at 399.  Applying Third Circuit precedent, the court will evaluate each alleged omission and false statement seriatim under the applicable standard.

### 1.  Two of the Alleged Omissions Were Made With Reckless Disregard For the Truth.

Defendants contend that Williams' grievance against Larnerd, history of illegal drug use, pending criminal charges, and criminal history were material facts that were omitted from Patrolman Houser's affidavit.  (Doc. 46, ¶¶ 8, 12; Doc. 56, ¶¶ 12–14.)  Larnerd also asserts that the patrolman recklessly stated that Williams had been in the residence on May 29 or 30, 2019, despite being aware that Ms.

Williams was not clear about the date and could have been in the residence as early as May 24, 2019.[7]  (Doc. 74, pp. 6–7.)  Although Larnerd characterizes this as a false statement, the court will review the statement under the omission standard for reasons explained below.

When examining an alleged omission, the Third Circuit has observed that a law enforcement officer cannot be expected to include every fact learned during the course of an investigation in an affidavit of probable cause in support of a search warrant.  *See Wilson*, 212 F.3d at 787.  On the other hand, a law enforcement officer who is invested in his own investigation is not sufficiently detached from the matter to make objective determinations about the materiality of information and the sufficiency of such information to establish probable cause to justify a search.  *Id.*  Recognizing this tension, the Third Circuit has held that "omissions are made with reckless disregard if an officer withholds a fact in his ken that '[a]ny reasonable person would have known that this was the kind of thing the judge would wish to know.'"  *Id.* at 788 (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)).

Moreover, in examining alleged omissions, the court needs to be concerned about the omission of objective information that is material to the magistrate

---

[7] Although Larnerd presented this argument for the first time in his reply brief, the facts underlying the argument were thoroughly examined at the *Franks* hearing.  Accordingly, the court will consider the argument.

judge's determination of probable cause rather than an affiant's subjective misgivings regarding information in the affidavit.  *See Yusuf*, 461 F.3d at 387; *see also Wilson*, 212 F.3d at 791 (omitting fact that eyewitness spotted defendant in a different location while the crime was ongoing); *Frost*, 999 F.2d at 743–44 (omitting fact that drug dog had not "alerted" to alleged courier's suitcase); *Jacobs*, 986 F.2d at 1234 (omitting fact that drug dog did not "alert" after stating that drug dog showed "interest" in defendant's bag).

### i.  The Omission of Williams' Supposed "Grievance" Against Larnerd

Applying this standard to the first alleged omission, which is the alleged "grievance" that Williams had with Larnerd, the court initially observes that the affidavit of probable cause omits any reference to a "grievance" held by Williams. (*See* Def. Ex. A.)  The affidavit does provide some objective facts about Williams' familiarity with the residence and her relationship with Larnerd.  Specifically, the affidavit states that Williams is friends with the owner of the residence, Kline, and that she lived at the residence "from March/April 2018 to December 2018 and was living at the residence when James Larnerd and his girlfriend "Becky" moved into the residence." (*Id.* ¶ 5.)  The affidavit also notes that she went to the residence on May 29 or 30, 2019 "to retrieve property."  Defendants argue that Patrolman Houser withheld the fact that Williams had a "grievance" against Larnerd, which is

the kind of thing that a judge would wish to know in order to assess the credibility of Williams' information.

The problem with Defendants' argument is that the characterization of Williams as having a "grievance" is a subjective determination rather than an objective fact. Patrolman Houser testified that Williams' initial reason for contacting the police station was to request assistance in resolving a "property dispute." However, Patrolman Houser did not offer police assistance to resolve the property dispute. Instead, he asked Williams to meet with him at the police station to provide information about possible illegal activity in the residence, which she obliged. There is no indication that Williams was promised any assistance with her "property dispute" in return for meeting in the station and providing this information. Williams was not a confidential informant, and the fact that she contacted the police initially for assistance in retrieving her property was not an objective reason for the officer to doubt the credibility of the information she voluntarily provided. This was particularly true since she was not under investigation by that officer and she initiated the contact with the police department. Patrolman Houser had the opportunity to observe Williams during a phone call and a meeting in person, and he did not perceive that she harbored any malice or ill will toward Larnerd. His observation was that she seemed frustrated with her inability to get her property back.

Under these circumstances, the officer's failure to include a subjective characterization that Williams had a "grievance" against Larnerd – a subjective misgiving about her credibility that he did not actually hold – is not an omission made in reckless disregard for the truth.

### ii.  The Omission of Williams' History of Illegal Drug Use

Applying the above standard to the second alleged omission, which is the fact that Williams had a history of illegal drug use, the court notes that the affidavit of probable cause does not include this information.  (*See* Def. Ex. A.)  The affidavit states only that Williams purchased methamphetamine from Larnerd on multiple occasions when she lived at the residence, but does not specify that she used the drug at any time.  (*Id.* ¶ 5.)  Patrolman Houser was aware that Williams was a "meth" user, but did not include that fact in his affidavit because he did not think it was relevant.  (Hr. Tr., pp. 33, 63.)   This is an objective fact that was clearly within the officer's ken and was omitted from the affidavit.

But that does not end the analysis.  The court has to determine whether this was "the kind of thing the judge would wish to know."  *Wilson*, 212 F.3d at 787.  This court concludes that the fact that Williams was a "meth" user was relevant information that a judge would want to know in order to assess the reliability of the information provided by Williams.

### iii. The Omission of Williams' Pending Criminal Charges and Criminal History

Applying the above standard to the third and fourth alleged omissions, which are the facts that Williams had pending criminal charges and prior criminal history, the court notes initially that the affidavit of probable cause does not include this information.  (*See* Def. Ex. A.)  Defendants established at the *Franks* hearing that there were pending criminal charges as well as prior criminal convictions against Williams at the time when the officer prepared his affidavit.  However, Defendants did not prove by a preponderance of the evidence that these facts were known by Patrolman Houser when he prepared his affidavit.  In fact, the testimony at the *Franks* hearing established the opposite—the officer did not obtain Williams' criminal background information because he did not feel it was necessary to check her criminal history under the circumstances.  He simply checked if there were any outstanding warrants or probationary supervision, and learned that there were not.  Simply put, the officer did not omit information about Williams' criminal background with reckless disregard because the fact of her criminal background was not within his ken.  *See Wilson*, 212 F.3d at 788.

Defendants argue nonetheless that Patrolman Houser *could and should have* discovered the pending criminal charges against Williams and her criminal history because this information would have cast doubt on her credibility and the reliability of her information.  There is no dispute that the officer *could have*

obtained the information.  However, the argument that the officer *should have*

obtained the criminal background information about Williams is vigorously

disputed by the Government.  The competing arguments about whether the officer

should have taken additional steps to investigate Williams and corroborate the

information she supplied are addressed in a subsequent section of this opinion.

However, for purposes of the omission inquiry, the analysis ends with the

conclusion that the court cannot hold that an officer omitted a fact in reckless

disregard for the truth when he did not know the fact.

> ### iv. The Omission of Williams' First Statement About the Date She Visited the Residence and Uncertainty About the Date

Applying the above standard to the fifth alleged omission, which is the fact

that Williams first stated that she went to the residence on or about May 24, 2019

and was apparently uncertain about the date when she visited the residence, the

court notes initially that the affidavit of probable cause does not include this

information.  Instead, the affidavit states: "Williams advised that on Wednesday

May 29, 2019 or Thursday, May 30, 2019 she went to [the residence] to retrieve

property."  (Def. Ex. A, ¶ 6.)  However, Patrolman Houser knew that in his first

interview of Williams by phone on May 31, 2019, she said that she went to the

residence "approximately one week ago" (which would be May 24, 2019).  (Def.

Ex. B, p. 8.)  He also knew that in his second interview of Williams on June 1,

2019, she reported that she went to the residence on either May 29 or 30, 2019.
(*Id.* at 9.)  Patrolman Houser was aware that Williams had uncertainty about the
exact date she went to the residence ranging from May 24 to 30, 2019.  (Hrg. Tr.,
pp. 12–15.)  Despite his awareness of Williams' first statement and apparent
uncertainty about the date, he stated in the affidavit only that she advised of a visit
to the residence on May 29 or 30, 2019.

Larnerd characterizes this as a false statement of fact.  However, the
statement in the affidavit that Williams advised that she went to the residence on
May 29 or 30, 2019 is accurate.  That was one of Williams' statements to the
officer.  So, the court does not agree that Patrolman Houser made a false statement
of fact in this instance.

However, the court is concerned about the information the officer left out.
The officer knew that prior to Williams stating that she went to the residence on
May 29 or 30, she previously stated that she went on or about May 24, 2019.  The
officer chose to relate only the second statement rather than both, and rather than
relating his knowledge that she had uncertainty about the date she went to the
residence.  In making that decision, the officer selected the two dates identified by
Williams that were closer in time to the date when the affidavit was prepared (June
3, 2019).  Williams' statement about the earlier date and her apparent uncertainty
about the date she went to residence and observed firearms and narcotics in the

residence were objective facts known by the officer that was the kind of thing that a judge would wish to know.  The amount of time that passed between the date when Williams observed the firearms and narcotics and the date of the application for a search warrant was relevant to the judge's analysis of probable cause for a search warrant, and also relevant to the reliability of the information provided by Williams.

### 2. The Alleged False Statement Was Not Made in Reckless Disregard for the Truth.

Turning to the one alleged false statement in the affidavit, the Third Circuit has explained that an assertion is made with reckless disregard when "'viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.'"  *Wilson*, 212 F.3d at 788 (quoting *United States v. Clapp*, 46 F.3d 795, 800 (8th Cir. 1995)).  In addition, the Third Circuit has held that the fact that information provided to the affiant later turned out to be incorrect is not determinative, because the *Franks* analysis focuses on whether a reasonable officer in the affiant's position "would have had an obvious reason at the time he submitted the affidavit to doubt the accuracy of the information."  *Yusuf*, 461 F.3d at 387.

Larnerd asserts that the affidavit contained a false statement because the quantity of drugs seized from the residence was significantly less than had been

described by Williams.[8]  (Doc. 46, ¶ 13; Doc. 47, p. 7.)  However, applying the above standard to this allegation, the court concludes that there was no reason for the officer to doubt the accuracy of the information regarding drug quantities that he reported in the affidavit at the time when he prepared his affidavit.

In the affidavit prepared on June 3, 2019, Patrolman Houser related that Williams said that she observed 4 to 5 ounces of methamphetamine in addition to marijuana and approximately 20 ecstasy pills in the kitchen area when she went to the residence on May 29 or 30, 2019.  (Def. Ex. A, ¶ 6.)  The fact that substantially smaller quantities of narcotics were seized when the search warrant was executed on June 4, 2019 does not prove that the officer falsely stated the information he relied upon.  It is Larnerd's burden to prove by a preponderance of the evidence that the affiant had obvious reason to doubt the accuracy of the information he reported when he reported it in his affidavit.  Larnerd does not meet his burden by proving facts learned the day after the affidavit was prepared.  Accordingly, Larnerd has not established that the affidavit contained a false statement made in reckless disregard for the truth.

---

[8] Defendant Swift does not argue this issue in her separate pretrial motion.

### 3.  The Omissions Were Not Material to the Determination of Probable Cause.

Because the court has determined that there was sufficient evidence of omissions made with reckless disregard for the truth, it is necessary to turn to the next step of determining whether the omissions at issue were material.  In order to make this determination, the court must insert the facts that were recklessly omitted, and then determine whether or not the "corrected" affidavit would establish probable cause.  *See Wilson*, 212 F.3d at 789; *Sherwood*, 113 F.3d at 399. In the end, Defendants must prove by a preponderance of the evidence that "probable cause does not exist under the corrected affidavit, i.e., that the deficiency in the affidavit was material to the original probable cause finding."  *Yusuf*, 461 F.3d at 383.

In conducting the probable cause analysis, the court must examine the "totality of the circumstances" related in the affidavit.  *Yusuf*, 461 F.3d at 390. Where, as here, the warrant affidavit cites hearsay information obtained from an informant, "the task . . . is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit[,] . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 235, 238–39 (1983).  This determination does not require absolute certainty that evidence of criminal activity

26

will be found at a particular place, but "rather that it is reasonable to assume that a search will uncover such evidence." *Yusuf*, 461 F.3d at 390.  Consideration of the "totality of circumstances" requires the court to "consider the cumulative weight of the information set forth by the investigating officer in connection with reasonable inferences that the officer is permitted to make based upon the officer's specialized training and experiences." *Id.* (citing *United States v. Arvizu*, 534 U.S. 266, 275 (2002)).

Initially, inserting into the affidavit the fact that Williams was a "meth" user in combination with the fact that she could not be certain about what date she went to the residence certainly casts some doubt on Williams' credibility and the reliability of the information she provided.  In addition, the fact that the date that Williams saw the narcotics and firearms in the residence could have been as early as May 24, 2019, which was ten days prior to the date the affidavit was prepared, creates some doubt about the probability that contraband or evidence of a crime would still be found in the residence.

However, the court has no difficulty concluding that the "corrected" affidavit would establish probable cause to search the residence for controlled substances and firearms even upon consideration of the inserted facts.  That is because the totality of the circumstances presented in the affidavit established a

fair probability that contraband or evidence of a crime would be found in the residence.

First, counsel in this case have made much of the characterization of Williams. The Government asserts that she is a "private citizen informant" who is entitled to a presumption of credibility. Defendants argue that she is more akin to a confidential informant or anonymous tipster, whose information needed to be corroborated because it was unreliable. The court concludes that Williams was neither an anonymous tipster nor a confidential informant, both of which raise special concerns. *See, e.g.*, *Gates*, 462 U.S. at 238–39 (addressing anonymous tip from unknown person); *United States v. Stearn*, 597 F.3d 540, 555 (3d Cir. 2010) (addressing confidential informant). Rather, she voluntarily contacted the police, was interviewed by phone and in person after providing her name, and provided information without any expectation of anything in return. *See United States v. Dennington*, No. 1:07-cr-43-SJM, 2009 WL 2591763, at *7 (W.D. Pa. Aug. 21, 2009) (concluding where informant's identity was known to law enforcement community the difficulties associated with anonymous tipsters are not present). Nonetheless, there remain valid concerns regarding Williams' credibility and the reliability of her information.

The initial report provided by Williams to law enforcement on May 31, 2019, was that Larnerd possessed and was selling narcotics from the residence, and

that Larnerd was a felon who was in possession of two handguns at the residence. (Def. Ex. A., ¶ 2.)  While there is reason to be concerned about Williams' veracity due to the inserted facts about her drug usage and uncertainty about dates, this concern is outweighed by the verification and corroboration of some of the information she provided.  *See United States v. Sanchez*, 246 Fed. App'x 803, 805 (3d Cir. 2007) (finding that courts may consider the reliability of the informant or the reliability of the information provided by the informant); *see also Gates*, 462 U.S. at 230 (holding that while an informant's "veracity" is "highly relevant" to the existence of probable cause, it is only one part of the larger common-sense determination).

Here, Patrolman Houser was able to verify Williams' assertion that Larnerd resided at the residence identified by Williams.  (Def. Ex. A, ¶ 3.)   In addition, the officer related that in his second interview of Williams on June 1, 2019, she said that she is friends with Kline, who owned the residence.  (*Id.* ¶ 5.)  The officer was able to verify that Kline owned the residence.  (*Id.* ¶ 3.)  Corroboration may, as in this instance, involve innocent information.  *See United States v. Rivera*, 347 Fed. App'x 833, 841 (3d Cir. 2009).  The officer also verified Williams' assertion that Larnerd is a felon, finding that Larnerd has felony narcotics convictions in 2003, 2009, and 2015 that prevent him from legally possessing a firearm.  (*Id.* ¶ 7.)  The use of prior convictions is often helpful to establish probable cause, particularly

where the conviction involves a crime of the same general nature as the one under investigation.  *See Stearns*, 597 F.3d at 557.

In addition, the officer made contact with Nye, who lives in a property neighboring the residence, to follow up on a complaint she made on May 17, 2019 about suspicious vehicle traffic to the residence.  Patrolman Houser related that Nye spoke with him by phone on June 1, 2019, and she described heavy vehicle traffic every day, with multiple vehicles arriving at the residence and the occupants going into the residence for short periods of time such as ten to fifteen minutes.  (Def. Ex. A, ¶ 4.)  It is reasonable to infer that the activity described by Nye was indicative of drug trafficking from the residence, which corroborates the information provided by Williams that a person (Larnerd) was selling narcotics from the residence.

In addition to the verification and corroboration of some of Williams' statements, the officer provided a description of Williams' basis of knowledge for the historical information she provided.  He related that she is friends with Kline, who owns the property, and she lived at the property from March or April 2018 until December 2018.  She was living at the residence when Larnerd and his girlfriend moved in, and she learned about Larnerd's drug use, possession, and trafficking because she was his customer and was aware that her friend Kline was also his customer.  (*Id.* ¶ 5.)

Accordingly, Williams provided a credible description of narcotics being present in the residence while she lived there up until December 2018. And then Nye provided information from which it was reasonable to infer that narcotics were being sold from the residence from May 17, 2019, when she made her initial complaint, until June 1, 2019, when Patrolman Houser spoke with her and she confirmed the ongoing suspicious vehicle traffic. Against this backdrop creating a reasonable suspicion of ongoing narcotics trafficking from the residence, Williams described a visit to the residence in late May, 2019, during which she observed a significant quantity of narcotics and two firearms in the residence. (*Id.* ¶ 6.) The fact that her visit occurred on a date ranging from May 24 to May 31, 2019, while the affidavit was prepared on June 3, 2019, does impact the probability that narcotics and firearms would still be present in the residence. However, looking at the totality of the circumstances described by Williams and Nye regarding the longstanding and ongoing nature of the activities, there was probable cause to believe that a search would uncover evidence of controlled substances, drug paraphernalia, and firearms in the residence, as indicated by the affiant. (*Id.* ¶ 9.)

### B. Defendants Argue That The Warrant Affiant Was Required To Conduct Additional Investigation to Corroborate Williams.

In addition to the argument that the officer made numerous omissions and a false statement in reckless disregard for the truth, Defendants also fault the officer for failing to take additional investigative steps to corroborate Williams' assertions

in light of the issues with her credibility and the reliability of her information. (Doc. 46, ¶ 9; Doc. 56, ¶¶ 15–16.)  Indeed, this is really the crux of Defendants' argument.  Through questioning of Patrolman Houser, Defendants clearly established that the officer *could have* conducted additional investigation, such as checking Williams' criminal history, learning about the pending criminal charge against Williams from the Middletown Police Department, conducting surveillance and undercover or controlled buys of narcotics from the residence, completing additional interviews, and reviewing cellphone records and/or Facebook messages.

In response, the Government argues that Patrolman Houser obtained sufficient verification and corroboration of Williams' statements to establish probable cause, and he did not have an obligation to conduct additional investigative steps under the circumstances present in this case.  The Government asks the court to decline to impose such an "unreasonable and unrealistic burden on the police."  (Doc. 71, pp. 13–15.)

While Defendants have persuaded the court that Patrolman Houser *could have* conducted additional investigation, which may or may not have corroborated the information provided by Williams, that is not the issue for this court to resolve. The only question before this court is whether the affidavit submitted by Patrolman Houser, once corrected to include the information that was recklessly omitted, established probable cause for the search of the residence.  And the court has

answered that question in the affirmative for the reasons stated above.  To continue the analysis beyond the probable cause determination made above and express an opinion about whether Patrolman Houser *should have* taken additional investigative steps goes beyond the task at hand, which is to apply the well-established *Franks* analysis to the affidavit of probable cause.  According to *Gates*, "after the fact scrutiny by the courts of the sufficiency of an affidavit should not take on the form of *de novo* review."  462 U.S. at 236.

### C. The Remaining Arguments Need Not Be Addressed.

There are two remaining arguments in this case, neither of which needs to be addressed due to the foregoing determinations.  The Government argues that if the warrant was invalid, the evidence need not be suppressed based on the "good faith exception."  (Doc. 71, p. 15.)   Swift argues that the statements she made to law enforcement following the execution of the search warrant and the contents of her cellphone should be suppressed because they are the "fruit of the poisonous tree" resulting directly from the allegedly invalid search warrant.  (Doc. 56, ¶¶ 23–24.) Because both of these arguments hinge on a determination that the search warrant was invalid, and the court has determined that the search warrant in this case was valid, there is no need to address the applicability of the "good faith exception" or the "fruit of the poisonous tree" doctrine.

## CONCLUSION

For the foregoing reasons, Defendants' suppression motions will be denied.

An appropriate order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated:  January 21, 2021